Jerry Wayne HAGAN,
Plaintiff-Appellant,

v.

EZ MANUFACTURING COMPANY,
Defendant-Appellee.

No. 81–2212.

United States Court of Appeals,
Fifth Circuit.

May 5, 1982.

Rehearing Denied June 8, 1982.

Maurice Amidei, Houston, Tex., for plaintiff-appellant.

Robert Ramey, H. Kent Twining, Houston, Tex., for defendant-appellee.

Before WISDOM, RANDALL and TATE, Circuit Judges.

WISDOM, Circuit Judge:

This products liability case involves an electric saw which allegedly was unreasonably dangerous because of a design defect. On the record before us, we are compelled to hold that the district court acted properly in granting the defendant's motion for a directed verdict. The plaintiff failed to present sufficient evidence for the case to go to the jury on allegations of a design defect and of a failure to warn causing the accident. We hold that, as a matter of law, the doctrine of products liability does not require a manufacturer to build a failsafe product.

### I.

The plaintiff/appellant, Jerry Wayne Hagan, is a resident and citizen of Houston, Texas. The defendant/appellee, EZ Manufacturing Co., is a Pennsylvania corporation which manufactures and sells gang saws. The defendant designed, manufactured, delivered, and installed one of its saws at a plant belonging to the Burgess Manufacturing Co. of Guthrie, Oklahoma.

Hagan was a resident of Guthrie, Oklahoma, and was employed at the Burgess plant at the time of his injury. He had previously worked as a machinist, a mechanic, and had done some electric wiring. At the defendant's plant Hagan headed the department which sawed raw material for warehouse pallets and operating materials for crates. He supervised ten to twelve persons working with a notching machine, a milling machine, a triple saw, and principally, the gang saw in question.

The intended use of the saw was to cut or mill wood to various lengths, shapes, and sizes. The saw was designed with a side

panel which opens to permit changing the blade or removal of weak or rotten wood that would frequently jam the saw. The record discloses that wood became smashed, thus jamming the saw about three to six times daily. In such cases, a worker would usually reach inside the saw with his hand and pull out the wood, but only after turning off the power.

The allegedly defective saw was part of a system which included a console located ten feet away, connected by wired conduits. The console was the power center of the system and included a functional red light indicator and the key to turn the power on and off. The system lacked a warning light, a buzzer, an automatic cut-off switch, or a close-at-hand manual cut-off power switch.

There was no device that would indicate at the site of the saw that the electric current was running. Ed Zimmerman, the President of the defendant company and designer of the saw in question, testified that it would have been feasible at a cost of about $200 to install a light, buzzer, or automatic cut-off switch on the side panel. The sides of the saw failed to carry a warning sign. But there were signs in large letters at the front and back of the saw, warning against operating the machine without guards and cautioning the operator to keep his hands clear when the machine was operating. According to the evidence adduced at trial, Hagan was well aware of the danger of putting his hand in the saw while the power was on. He had frequently instructed the crew whom he supervised not to remove any wood without first turning off the power.

According to the district court's findings of fact, on August 13, 1979, Hagan went to work as usual at 7:00 a. m. At the job he noticed that the saw was shut down. He went over to investigate, for it was his job to keep the assembly line moving. As he approached the saw, Hagan noticed that a side panel had been removed. The men were attempting to extract a piece of wood which was clogging the saw.

Hagan did not know whether the power was on or off. The saw was noisy when running, but it was not noisy now. The rollers and blades were not running. Hagan saw broken pieces of wood in between the blades. He took hold of a piece of wood and pulled it out of the jammed saw. As he did, the wood came in contact with the microswitches between the rollers, activating the rollers. The rollers came down and caught the plaintiff's hand between the wood and the top down-clamped roller.

The purpose of the rollers is to put pressure on a piece of wood or cant to force it through the saw blade. In operation, the rollers are activated by the microswitches which are on a little rubber flap that sticks up. When the cant freezes over the switch, it pushes the switch over and activates the hydraulic rollers. Each of these rollers comes down and clamps on the wood with about 600 pounds of pressure.

In this case, when the saw became operational upon the removal of the wooden block, the roller came down and clamped on Hagan's fingers. He jerked his hands up as the rollers came down, but his left middle finger was nearly torn off and his right little finger was smashed. Both fingers are stiff, thick, sore, and permanently injured. At the trial a physician testified that in reasonable medical probability, the plaintiff suffered a 10 percent loss of function as a result of the injury. The scarring affects his enjoyment of life; in particular, the stiffness of the fingers impairs his guitar playing, one of his favorite sidelines.

The plaintiff filed a diversity suit for personal damages against the defendant on March 19, 1980, for the injuries he sustained. In April 1981, the plaintiff presented his case-in-chief based upon products liability concepts of design, manufacturing, and warning defects. The district court apparently granted the defendant's motion for directed verdict on three grounds: (1) that there was no legally competent evidence concerning the issue of defective design; (2) that there was no evidence that any failure to warn was a producing cause of the injury; and (3) that the plaintiff

assumed the risk of any dangers incident to the use of the product. The district court signed and entered final judgment for the defendant on April 27, 1981.

## II.

■ In this diversity suit, the substantive law of Oklahoma applies. *Erie Railroad Co. v. Tompkins*, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; *Porter v. American Optical Corp.*, 5 Cir. 1981, 641 F.2d 1128. The Oklahoma Supreme Court has set out the elements of proof in a products liability case in the seminal case, *Kirkland v. General Motors Corp.*, Okl.1974, 521 P.2d 1353. Under Oklahoma law, there are three elements of products liability: *First*, the plaintiff must prove that the product was the *cause* of the injury; *second*, the plaintiff must prove that a *defect* existed in the product at the time it left the manufacturer's control; and *third*, the plaintiff must prove that the defect made the product "*unreasonably dangerous*", to the extent beyond which would be contemplated by the ordinary purchaser. 521 P.2d at 1355; *Sterner Aero Ab v. Page Airmotive, Inc.*, 10 Cir. 1974, 499 F.2d 709, 713.

The court in *Kirkland* adopted the Restatement (Second) of Torts § 402A (1965), which bases liability on the two critical concepts of "defective condition" and "unreasonably dangerous". With regard to the "defective condition" requirement, Comment *g* to § 402A Restatement (Second) of Torts at 351 states:

"The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him."

With regard to the "unreasonably dangerous" requirement, Comment *i* to § 402A Restatement (Second) of Torts at 352 states:

"The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common in the community as to its characteristics."

A majority of the courts have required a plaintiff to prove both the defective condition and the unreasonably dangerous nature of a product. *See, e.g., Kleve v. General Motors Corp.*, Iowa, 1973, 210 N.W.2d 568; *Brown v. Western Farmers Ass'n*, 1974, 268 Or. 470, 521 P.2d 537; and *Jagmin v. Simonds Abrasive Co.*, 1973, 61 Wis.2d 60, 211 N.W.2d 810. Some courts have eliminated the "unreasonably dangerous" requirement. *See, e.g., Cronin v. J.B.E. Olson Corp.*, 1972, 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153; and *Glass v. Ford Motor Co.*, 1973, 123 N.J.Super. 599, 304 A.2d 562. Other courts have eliminated the "defective condition" requirement. *See, e.g., Ross v. Up-Right, Inc.*, 5 Cir. 1968, 402 F.2d 943; and *Seattle-First National Bank v. Tabert*, 1975, 86 Wash.2d 145, 542 P.2d 774. In interpretating the Oklahoma law, the Tenth Circuit proceeded on the basis that both requirements must be satisfied. *Bruce v. Martin-Marietta Corp.*, 10 Cir. 1976, 544 F.2d 442, 447. We proceed on the same basis. *See Freund v. Cellofilm Properties, Inc.*, 1981, 87 N.J. 229, 432 A.2d 925, 935-36, comparing the law in different jurisdictions.

## III.

Motions for a directed verdict have a high mortality rate in this circuit. Nevertheless, in the proper case they protect the integrity of the law from the vagaries of the civil jury system.

As noted, the district court found first that there was "no legally competent evidence that the product in question was defectively designed". The plaintiff failed to produce expert testimony on the design and safety engineering aspects of the saw.[1]

---

1. There is, of course, no hard and fast rule requiring expert testimony in a products liability case based on an alleged design defect. In *Randolph v. Collectramatic*, 10 Cir. 1979, 590 F.2d 844, however, a case involving Oklahoma law, the Court of Appeals affirmed a directed verdict for the defendant on the plaintiff's failure to provide a qualified engineer to testify as to the safety design aspects of a pressure cooker.

There was, however, some evidence that installation of a safeguard might have prevented the accident. For example, Ed Zimmerman, the President of the defendant company and designer of the saw, admitted that a cut-off, an interlock switch, or other protective device was feasible at a reasonable cost. The trial judge concluded, however, that this bit of testimony was not sufficient to establish a prima facie case of product liability.

■ In a diversity case, a federal court applies a federal rather than a state standard for determining whether there is sufficient evidence to create a jury question. *Boeing Co. v. Shipman*, 5 Cir. 1969, 411 F.2d 365; *Maxey v. Freightliner Corp.*, 5 Cir. 1982, 665 F.2d 1367. The court must consider all of the evidence and all reasonable inferences in the light most favorable to the party opposed to the motion, here the appellant. 411 F.2d at 374–75. Under that strict standard the trial judge determined that reasonable men could not have found that the gang saw was so defective as to be unreasonably dangerous.

■ Under Oklahoma law, a defective condition must be "unreasonably dangerous" for there to be strict liability in products cases. "Unreasonably dangerous" is defined as "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Kirkland v. General Motors Corp.*, Okl.1974, 521 P.2d 1353, 1355; *Smith v. United States Gypsum Co.*, Okl.1980, 612 P.2d 251; Restatement (Second) of Torts, § 402A, Comment *g* at 351.

■ The appellant contends that the sole issue is whether a manufacturer should anticipate all foreseeable uses of his product. He argues that this is a jury question, because wood gets clogged in saws and some users might leave the power connected while unclogging the wood. *Smith v. United States Gypsum Co.*, Okl.1980, 612 P.2d 251; *Parks v. Allis Chalmers Corp.*, Minn.1979, 289 N.W.2d 456. The doctrine

of manufacturer's products liability, however, cannot be said to require a manufacturer to build a failsafe product. *Stuckey v. Yang Exploration Co.*, Okl.1978, 586 P.2d 726; *Gates v. Ford Motor Co.*, 10 Cir. 1974, 494 F.2d 458. Evidence that a product is defectively designed does not necessarily determine whether a product is unreasonably dangerous. "Safety is not the only criterion a manufacturer considers when designing a product." *Ward v. Hobart Mfg. Co.*, 5 Cir. 1971, 450 F.2d 1176, 1184.

■ Many products have both utility and danger. A product is unreasonably dangerous if its utility does not outweigh the magnitude of the danger inherent in its introduction into commerce. *Borel v. Fibreboard Paper Products Corp.*, 5 Cir. 1973, 493 F.2d 1076, 1087, *cert. denied*, 1974, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107. The court is required to consider the legitimate interests of both the manufacturer and the consumer. This court has held that the standard to be applied in that balancing process is that "a product is defective and unreasonably dangerous if a reasonable seller aware of the dangers involved would not sell the product or if the risk of injury exceeds that contemplated by an ordinary and reasonable consumer." *Hagans v. Oliver Machinery Co.*, 5 Cir. 1978, 576 F.2d 97, 100; *Welch v. Outboard Marine Corp.*, 5 Cir. 1973, 481 F.2d 252, 254.

■ We follow this court's directions in *Hagans v. Oliver Machinery Co.*, 5 Cir. 1978, 576 F.2d 97. In *Hagans* this court found that by designing a saw with a removable blade, as in the present case, the defendant manufacturer struck a compromise that maximized the product's utility and safety. 576 F.2d at 101. The plaintiff in *Hagans* presented evidence that the defendant manufacturer had known in 1942 that commercial table saws accounted annually for a large number of industrial accidents, that technology was available in 1942 to attach permanently the blade guard assembly to the saw, and that the plaintiff's injury would have been avoided had the saw been equipped with the blade guard. Despite this evidence, this court determined:

In particular, the construction industry is a cornerstone of the American economy and a major contributor to the standard of living in this country. Unfortunately, the nature of the industry is such that its tools, from the smallest tack hammer to the largest earth mover, expose certain risks of harm to their users. Nevertheless, unless civilization is to grind to a halt, these tools, including industrial table saws, must continue to be marketed despite their inherent dangers. Clearly, therefore, defendant's product is not unreasonably dangerous per se.

576 F.2d at 101. Similarly, although the evidence presented to the district court in this case suggests that the allegedly defective saw design was inadequate to prevent all accidents, such evidence fails to dictate a finding that the design was "unreasonably dangerous".

### IV.

The district court granted the defendant's motion for directed verdict on a second ground, namely, that the plaintiff's case lacked evidence showing that the defendant's failure to warn him of danger caused the plaintiff's injury.

 The Oklahoma Supreme Court has determined that "in order to escape being *unreasonably* dangerous, a *potentially* dangerous product must contain or reflect warnings covering all foreseeable uses. These warnings must be easily understandable and make the product safe." (The court's own emphasis.) *Smith v. United States Gypsum Co.*, Okl.1980, 612 P.2d 251, 254. It is a well-accepted principle that the failure to warn may be, in itself, a defect in the product. *Barber v. General Electric Co.*, 10 Cir. 1981, 648 F.2d 1272, 1277; *Smith v. United States Gypsum Co.*, Okl.1980, 612 P.2d 251. And the adequacy of a warning may be a question for the jury. In developing a prima facie case, however, a plaintiff must establish that the failure to warn or that an inadequate warning was a proximate, producing cause of the injuries he received.

 It is uncontested that the defendant's gang saw had warnings posted on the front and back. In large letters the user was cautioned:

KEEP HANDS CLEAR WHEN
MACHINE IS OPERATING

DO NOT OPERATE THIS MACHINE
WITHOUT GUARDS IN PLACE

The plaintiffs contends, irrespective of the warnings on the front and back of the saw, that what was required was a warning on the side panels, saying, for example, "Don't take the side of this off." The side panels, however, were designed to slide in slots "for a safety factor and to keep the sawdust inside," "to change blades," to remove clogging wood when the machine became jammed, and for cleaning purposes.

The appellant failed to show that the accident would have been avoided had there been adequate warning on the side panels. In fact, the plaintiff came to the machine after the side panels had already been removed, so that the warning he demands would have been of little help. The plaintiff knew of the inherent danger of the saw and apparently simply assumed that the power was off. In *Hagans*, this court noted:

> Implicit, therefore, in the duty to warn is the requirement that the user be ignorant of the dangers warned against. *Cf. Technical Chem. Co. v. Jacobs*, 480 S.W.2d 602 (Tex.1972) (in strict liability case manufacturer's failure to warn must be a producing cause of plaintiff's injury).

576 F.2d at 102.[2]

We find that the district court was correct in its determination that the plaintiff

---

**2.** Continuing, the court said:
> Thus, it is generally held that there is no duty to warn when the danger or potentiality of danger is obvious or is actually known to the injured person. *See e.g. Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457, 466–67 (5th Cir.

1976) (manufacturer of dripolene not strictly liable for failure to warn of dangerous nature of its product and of the precautions necessary for safe handling since crew member, plaintiff's decedent, "knew of the dangers associated with entry into tanks which had

failed to show that the alleged failure to warn caused his injury.

## V.

The district court granted the defendant's motion for directed verdict on a third ground, namely, that the plaintiff assumed the risk of any dangers incident to the use of the product. On this point, the district court erred. An Oklahoma Statute provides that the "assumption of the risk" defense is a question of fact for the jury. 23 O.S.Supp.1973 § 12.

Initially, the district judge stated: "And, further, as a matter of law, Plaintiff assumed the risk of any dangers incident to the use of the product." But, when he brought in the jury and summarized his decision before dismissing them, he made no mention of assumption of the risk defense. Then he mentioned only "that the Plaintiff has not established any defective design in this case nor has he established that the failure to warn him of the dangers incident to the use of the machine was a producing cause of his injury." We conclude that, on reflection, the district judge meant to limit his grounds for the directed verdict to the issues of design defect and adequate warnings.

Accordingly, we AFFIRM the judgment of the district court.

TATE, Circuit Judge, dissenting:

I respectfully dissent. Were we affirming a jury verdict that rejected the plaintiff Hagan's contention that the machinery as designed was "unreasonably dangerous," there is little in the majority opinion with which I would disagree. Here, however, despite evidence that at slight cost a readily foreseeable and serious hazard of the machinery's use could be obviated, the district court directed a verdict dismissing the suit, without affording the trial jury an opportunity to assess whether the design defect created an "unreasonably dangerous" hazard in the product's foreseeable use.

Apparently, our standard for determining when a directed verdict is proper can bear repeating. As we stated in *Boeing Company v. Shipman*, 411 F.2d 365, 375 (5th Cir. 1969) (en banc):

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the nonmover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

For reasons to be specified more fully below, I believe the evidence before the jury permitted reasonable and fair-minded men to infer that the machinery was unreasonably dangerous in its lack of any safety device with regard to the recurrent (three or four times a day) situation when the wood became blocked in the saw machinery. To unblock the wood, a worker had to remove a side-panel and reach inside the machinery. It was admittedly an operation extremely hazardous to the worker's hands, which could become amputated when the wood was unblocked and the saw machinery commenced again to operate, *unless the power was first cut off at a console some ten feet away from the machine.*

Under the applicable Oklahoma products liability law, the issue, as I see it, is wheth-

---

carried dripolene and its constituents"); *Posey v. Clark Equip. Co.*, 409 F.2d 560 (7th Cir.) (manufacturer of forklift truck designed without overhead guard not strictly liable for failure to warn of danger is generally known and appreciated and is obvious to anyone, particularly the forklift's operator), *cert. denied*, 396 U.S. 940, 90 S.Ct. 374, 24 L.Ed.2d 242 (1969); Annot., 53 A.L.R.3d 239 (1973). 576 F.2d at 102.

er the machinery was unreasonably dangerous to normal and foreseeable use because of the lack of an automatic cutoff of the machinery upon removal of the side-panel, or of a buzzer or warning light by way of alert; whether such safety device was reasonably required to prevent or minimize the foreseeable and recurrent hazard: that (as here) one unaware that another worker had *not* cut off the machinery at the console switch, but assuming that such *had* been done in accord with standard instructions, might have his hands seriously injured in the recurrent and regular operation of unblocking the wood.

A leading Oklahoma products liability decision, *Smith v. United States Gypsum Company*, 612 P.2d 251 (Okl.1980), cited by the majority, recognizes this as an actionable products liability hazard. In upholding a verdict against the manufacturer upon a similar theory, the Oklahoma Supreme Court referred to the holding in *Parks v. Allis Chalmers*, 298 N.W.2d 456 (Minn.1979) that "there was sufficient evidence for the jury to conclude that the manufacturer knew, or should have known 'that some power users would leave the power unconnected while unclogging.'" *Smith, supra,* 612 P.2d at 254. (The *Parks* decision, incidentally, upheld a verdict for the plaintiff in a manufacturer's products liability case with facts virtually indistinguishable from the present.)

As the majority notes, the determination of whether the machinery is unreasonably dangerous for such reason involves a weighing of the magnitude of the danger against utility factors (cost, efficiency, etc.) required to prevent it. The majority also admits that the testimony of the defendant's president shows that a cut-off or other protective device was feasible at reasonable cost.

The evidence as to the crucial issue was admittedly skimpy. It included only the cited testimony of the defendant's president, and of the plaintiff Hagan himself as to the recurrent nature of the hazard. It undoubtedly would have been preferable for the plaintiff to have secured expert witnesses. They, however, would have testified to nothing further than what the lay evidence shows: that the recurrent risk was of sufficient magnitude as to create a hazard, and that it was easily feasible at little expense to avoid the risk without loss of efficiency. The majority comes dangerously close to holding that a hazard—obvious to the common-sense of the jury, as developed by lay evidence—may not be proved without the shibboleth of formula testimony by Ph.D. experts.

I believe the majority fell into error in so insinuating. I do not think either the district court would have granted, or the majority upheld, a directed verdict if the plaintiff had produced such experts who, actually, would testify to no more than the ultimate evidence before the present jury. As stated by the Tenth Circuit, in affirming the *denial* of a directed verdict (and involving the application of Oklahoma products liability law under circumstances generically similar to the present): "In determining whether a machine is defective in design, the jury is entitled to weigh the ease of construction of a safety device against the magnitude of threatened harm in not constructing it. If the latter is of great magnitude and the former is relatively inconsequential, the trier may determine that the machinery was defectively designed." *Davis v. Fox River Tractor Company*, 518 F.2d 481, 484 (10th Cir. 1975).

Accordingly, I respectfully dissent in our affirmance of the grant of a directed verdict, for I believe that there was sufficient evidence as the unreasonableness of the hazard as, under the applicable Oklahoma law, to raise an issue of fact triable by the jury.